# EXHIBIT 13

in Support of Defendants' Daubert Motion to Exclude the Expert Reports and Testimony of Robert G. Wallace, JR.

**RESPONSE TO REBUTTAL REPORT OF ROBERT WALLACE**

**Introduction**

1. The following is my response to Mr. Wallace's rebuttal report, dated March 22, 2021. In brief, Mr. Wallace misconstrues the purpose and scope of my survey, his own survey uses an inappropriately narrow universe of respondents, he misinterprets data from my survey, he misunderstands the purpose of a control, he relies heavily on ipse dixit arguments, and he appears to make legal conclusions.

**Mr. Wallace Misconstrues the Purpose and Scope of the Ezell Survey**

2. American Customer Satisfaction Index, LLC, in its First Amended Complaint, asserts that the ACSI name and its purported marks "have become well recognized in the field of customer satisfaction surveying, analytics, and benchmarking."[1] In order to empirically test that claim, I designed and conducted a survey to measure whether or not ACSI has become well recognized in the field of customer satisfaction.[2] My survey questions were designed to address this assertion.

3. Although clearly set forth in my report,[3] Mr. Wallace repeatedly misstates or misconstrues the purpose and scope of my survey.[4] While I note that the level of recognition obtained by the term ACSI falls well short of the approximately 50% association generally required to show secondary meaning, I did not conduct a secondary meaning survey. Furthermore, a respondent is more likely to answer 'yes' to a recognition question than they

---

[1] First Amended Complaint, p. 6, par. 27.
[2] Specifically, my survey was designed to measure whether individuals involved in obtaining data about their company's customer satisfaction in the prior two years recognize ACSI. Ezell report, p. 1.
[3] Ezell report, p. 1, paragraphs 2-3.
[4] *See, e.g.*, Wallace Rebuttal, p. 2 "…the survey questionnaire seeking to determine the secondary meaning of the term…"; p. 5 "…survey respondents were clearly confused over FHXN…"; pp. 5-6 Section E.

are to identify a named source in response to a secondary meaning question. It is therefore reasonable to conclude that, all else equal, a secondary meaning survey would yield lower levels of named association than a recognition survey would yield affirmative recognition. Regardless, it remains my opinion that the term ACSI is not well recognized in the field of customer satisfaction.

### Given The Purpose and Scope, My Universe Was Proper

4.  Given Plaintiff's broad assertion about ACSI's purported recognition in the field of customer satisfaction,[5] its distribution to the public in media such as newspapers,[6] and my survey's objective of measuring the recognition level of ACSI in the field of customer satisfaction, it was appropriate for me to select a universe of respondents who are involved in obtaining customer satisfaction data for their company. Accordingly, Mr. Wallace's criticisms of my universe, including that it is overinclusive, are meritless.

### Mr. Wallace's Survey Universe Is Inappropriately Narrow and Biased

5.  Mr. Wallace claims his own universe was "proper," but it was inappropriately narrow and biased. Given the broad scope of ASCI's purported recognition, Mr. Wallace's survey universe should have targeted individuals involved in obtaining data about their company's customer satisfaction. Yet, as discussed further below, Mr. Wallace further limited his survey to a subset of the field, namely, individuals in the U.S. who have "been involved in securing data about customer satisfaction on behalf of a company that is valued at $30 million

---

[5] ACSI's First Amended Complaint, page 6, par. 27. ("The ACSI name and its marks have become well recognized in the field of customer satisfaction surveying, analytics, and benchmarking.")
[6] CFIGroup_0464381 ("…the American Customer Satisfaction Index (ACSI)…published in leading newspapers such as *The Wall Street Journal, The Washington Post*…")

or more, or for a state or federal agency" and who were "aware of the ACSI".[7] Furthermore, Mr. Wallace offers no explanation as to how he arrived at the "$30 million or more" figure for his survey in the present matter, nor does he explain why he adopted this threshold over the "$100 million or more" figure from the survey he conducted in another matter involving ASCI.[8] Additionally, Mr. Wallace offers no explanation as to why he excludes "Anyone that reported taking the survey using their phone" from his survey, nor does he provide a final disposition table indicating how many respondents were terminated due to taking the survey on their phone.

6. Mr. Wallace criticizes my survey for allegedly having a non-representational survey universe, but he misconstrues the guidance from the literature to which he cites. Mr. Wallace asserts that the "proper audience for survey respondents must include the relevant consuming public, or those who have purchased, or may in the future purchase the services of the entity in question"[9] and cites to Dr. Shari Diamond's Reference Guide on Survey Research. However, the portion of the Reference Guide on Survey Research cited by Mr. Wallace only provides the most general guidance, using language such as "in some disputes" and "may include."

---

[7] Wallace report, pp. 11-12. I have reviewed only the portions of Mr. Wallace's opening report that appear to apply to his criticisms of my survey. I have formed no opinions regarding Wallace's opening report other than those expressed herein.
[8] P. 7 of Wallace report dated December 19, 2019 in the matter of American Customer Satisfaction Index, LLC v. Genesys Telecommunications Laboratories, Inc. et al v. CFI Group USA, LLC.
[9] Wallace rebuttal, p. 2.

7.      Other literature provides a more in-depth look at survey universe. Specifically, a chapter entitled THE UNIVERSE in Trademark and Deceptive Advertising Surveys[10] – which is notably co-edited by the same Dr. Shari Diamond who authored the Reference Guide on Survey Research – observes that surveys with underinclusive universes (i.e., surveys that exclude segment(s) of relevant consumers) are "routinely rejected or discounted where the segment of consumers tested has specialized knowledge or characteristics likely to skew the results in favor of the party conducting the survey…Other examples include surveys limited to participants having expertise not possessed by ordinary consumers of the relevant products or services."[11]

8.      Mr. Wallace's universe definition guarantees bias by requiring his survey respondents to be aware of ACSI as a prerequisite to their participation. By excluding past and potential customers who are not aware of ACSI, Mr. Wallace created a biased, underinclusive survey universe of respondents that has specialized knowledge or characteristics (previous knowledge of ACSI and/or having previously been a customer of ACSI, LLC) likely to skew the results in favor of the Plaintiffs – the exact flaw that THE UNIVERSE identified as a routine reason to exclude a survey.

9.      Mr. Wallace erroneously asserts that the data from his survey – conducted among individuals who were "aware of the ASCI brand and could accurately name it by

---

[10] Barber, W. G. (2012). The Universe in *Trademark and Deceptive Advertising Surveys: Law, Science, and Design*. American Bar Association, Section of Intellectual Property Law.

[11] *Id.*, pp. 42-44, discussing Brooks Shoe Mfg. Co. v. Suave Shoe Corp. 533 F. Supp. 75 (S.D. Fla. 1981), aff'd, 716 F.2d 865 (11th Cir. 1983) (the district court discounted Plaintiff's secondary meaning survey results stating: "Plaintiff's universe…is far too narrow to give a fair indication of whether the consuming public associates [Plaintiff's claimed mark] with [Plaintiff]…The people interviewed were those most likely to recognize the [Plaintiff's mark] rather than people whose opinions would fairly represent the opinions of consumers of [Plaintiff's and Defendant's goods and services]."

confirming what the initials ACSI represents"[12] – support a conclusion that "ACSI Marks have become well recognized…".[13] His study was limited to a subset of those who are in the field of customer satisfaction, namely – those who have the "specialized knowledge" of being aware of the term ACSI and further being able to state (or perhaps look up) the acronym of ACSI as 'American Customer Satisfaction Index.' As a result, Mr. Wallace's survey is skewed and merely demonstrates the tautology that individuals who know ACSI know ACSI.

### Allegedly Irrelevant Respondents

10.     Mr. Wallace opines without citing any authority that respondents to my survey who work for companies with 1 to 9 employees are irrelevant. He asserts that "[t]his screening criteria is not the relevant universe because it does not encompass CFI LLC's or ACSI LLC's relevant past or present consuming public or their potential future customers.[14] However, according to the deposition testimony of Mr. VanAmburg, both CFI and ForeSee contracted with The Federal Consulting Group (FCG), which is an entity of 9 employees according to the FCG website.[15] Mr. Wallace cites no evidence that individuals from companies with fewer than 10 employees are irrelevant in the field of customer satisfaction or would not be able to recognize the term ACSI.

11.     Curiously, Mr. Wallace criticizes my survey universe of individuals who were involved in the past 24 months in obtaining data about their company's customer satisfaction

---

[12] Wallace report, p. 11.
[13] Wallace report, p. 7.
[14] Wallace rebuttal, p. 3; "This is an obvious and fatal flaw in Mr. Ezell's survey that, in my opinion, disqualifies it and its findings as being relevant to the issues in this case. Because the universe of respondents is highly improper, the survey results are not trustworthy, relevant, or helpful."
[15] https://www.fcg.gov/team

when his own survey screener used nearly identical wording.[16] In the Genesys case and in this case, Mr. Wallace initially targeted, generally speaking, the same general population as I did, but then improperly further restricted his universe based on an arbitrary threshold[17] and a requirement of specialized knowledge (i.e., only individuals who could "accurately name [ACSI] by confirming what the initials ACSI represents").[18]).

12. Furthermore, Mr. Wallace chooses hyperbole over substance by claiming that the inclusion of companies that employ fewer than 10 people in my survey universe is "an obvious and fatal flaw." First, as explained above, this is not a flaw given ACSI's broad claims in the field of customer satisfaction. But, even if Mr. Wallace's unsupported supposition were valid and one disregards the data from respondents who work at companies of 1 to 9 employees (an option I made available to Mr. Wallace given that I turned over my survey's underlying data in its native Excel format), the net aided recognition of ACSI would only marginally increase – from 23.5% to 24.4%. As such, even if Mr. Wallace's criticism had merit (which it does not), my opinions regarding the lack of recognition of ACSI would not change.

### Mr. Wallace's Unexplained Recognition Figure

13. Mr. Wallace claims that his report shows a "93.8% awareness of ACSI and accurate association of it with American Customer Satisfaction Index."[19] Neither his initial report nor his rebuttal report explain how he arrived at this figure. (A search performed in both

---

[16] Compare my question S5 ("In the past 24 months, which of the following activities, if any, have you been involved in?" and response choice "Obtaining data about your company's customer satisfaction", Ezell report, Appendix A, p. 2) and Wallace's Q2a ("In the last 24 months have you been involved in securing data about customer satisfaction on behalf of a company that is valued at $30 million or more, or for a state or federal agency?")
[17] In the Genesys case, Mr. Wallace used a $100 million threshold. In this case, he used a $30 million threshold.
[18] Wallace report, p. 11.
[19] Wallace rebuttal, p. 6.

reports located no reference to "93.8.") This is especially puzzling because, as discussed earlier, his survey terminated all respondents who did not affirmatively answer the question, "Are you aware of the ASCI?"[20] Since the data provided by Mr. Wallace only pertains to the 200 respondents that answered affirmatively and understood ACSI to be American Customer Satisfaction Index, it would seem that Mr. Wallace should have reported a 100.0% awareness of ACSI. His claim regarding a "93.8% awareness of ACSI" does not appear to be based on any data contained in his report.

**Mr. Wallace Misinterprets Data from the Ezell Survey**

14. Mr. Wallace's criticisms demonstrate an apparent lack of understanding of recognition survey data and analysis. In a recognition study, it is entirely logical and expected that the level of unaided recall (i.e., percent of respondents who mention a name unprompted) will be less than the level of aided recognition (i.e., percent of respondents who answer affirmatively when asked if they have heard of a particular name). Yet Mr. Wallace takes issue that "none of the scores of [the Ezell survey] *unaided* awareness test produced recognition at a 50% level."[21] Such a comment indicates a lack of familiarity with a recognition study and wholly ignores the data from the aided portion of my study as discussed further below.

15. In his rebuttal report, Mr. Wallace asserts that it is "highly improbable" that my survey allegedly demonstrates that J.D. Power does not have secondary meaning in the field of customer satisfaction,[22] citing the 17% <u>unaided</u> awareness figure in Table 1 of my report. At the outset, as set forth above, my survey was directed to awareness, to empirically test ACSI, LLC's

---

[20] Wallace report, p. 12.
[21] Wallace rebuttal, p. 6 (emphasis added).
[22] Wallace rebuttal, pp. 5-6.

assertion in the Amended Complaint that "ACSI" is well recognized in the field of customer satisfaction. But even taking Mr. Wallace's argument at face value, he wrongly ignores the <u>aided</u> recognition numbers of my report. For example, in regards to his reference to J.D. Power, Table 3 of my report shows that the net aided recognition for J.D. Power was 87.5%, a figure comfortably above the 50 percent figure typically required to show secondary meaning. Thus, putting aside any issue of whether a term needs to demonstrate an acquired distinctiveness, Mr. Wallace ignores the remarkably strong recognition figure obtained by J.D. Power in drawing his incorrect conclusion that my results were "highly improbable."

16. Mr. Wallace points to mentions of behemoths such as Amazon and Google (and the absence of mentions of companies like ACSI, CFI, and ForeSee) to my survey's *unaided* recognition questions as alleged evidence that respondents "lacked even basic knowledge of the customer measurement [sic] industry."[23] The more straightforward interpretation is that ACSI, CFI, and ForeSee are simply not top-of-mind companies as compared to Amazon and Google. Alternatively, individuals involved in obtaining customer satisfaction data for their company may simply collect data in-house and not rely on third-party providers, a trend observed by Dr. Fornell himself.[24]

17. Mr. Wallace also takes issue with the question wording and the responses to my survey's Q3 and Q4.[25] Although Mr. Wallace calls the word "measure" ambiguous,[26] I chose to

---

[23] Wallace rebuttal, p. 5.
[24] CFIGroup_0029667 ("The market shift to more do-it-yourself work by clients re customer experience monitoring management has been difficult to combat.").
[25] Wallace rebuttal, p. 3.
[26] Wallace rebuttal, p. 4.

use the word "measure" in my survey based upon the language used by ACSI in its methodology paper and on its website.[27]

18. For no apparent reason other than Mr. Wallace's disapproval of the low level of unaided recognition of ACSI, he calls the responses to my questions[28] "nonsensical" or "entirely unresponsive."[29] These criticisms are incorrect. Mr. Wallace splits hairs by asserting that "Surveys / Polling / Polls" are "way[s] to obtain a customer satisfaction 'measure' but they are not themselves a measure."[30] Again, the assertion being tested is that the purported mark ACSI has become well recognized in the field of customer satisfaction surveying, analytics, and benchmarking. Mr. Wallace's argument challenges common sense and contrasts with language from the "About" page of ACSI's website.[31] Mr. Wallace's assertions are pure ipse dixit, and not based on any survey data of his own.

**Mr. Wallace Misunderstands the Purpose of a Control**

19. In experimental survey design, a control cell or control question allows the researcher to account for potential mismeasurement error in the test cell caused by such factors as leading questions (e.g., "What brand [singular] of cereal comes in a yellow box?" may bias respondents toward a single source), respondent guessing, preexisting beliefs (e.g., a belief

---

[27] ACSI Methodology Paper, June 2008, p. 1. ("The American Customer Satisfaction Index (ACSI) is a uniform, national, cross-industry *measure* of satisfaction…") (emphasis added) and https://www.theacsi.org/about-acsi. ("The American Customer Satisfaction Index (ACSI) is the only national cross-industry *measure* of customer satisfaction in the United States. The Index *measures* the satisfaction of U.S. household consumers…") (emphasis added).
[28] Ezell report, pp. 4-5. (Q3: "Please list any customer satisfaction measures you can think of." Q4: "Can you think of any other customer satisfaction measures?")
[29] Wallace rebuttal, p. 4.
[30] *Ibid*.
[31] https://www.theacsi.org/about-acsi. ("Each year, roughly 500,000 customers are *surveyed* about the products and services they use the most. The *survey data* serve as inputs to an econometric model that benchmarks customer satisfaction…") (emphasis added).

that all shoes are made by Nike), agreement bias or "yea-saying" (e.g., affirmative response to all questions), and so forth.

20. Mr. Wallace asserts that my survey is unreliable because 8.5% of the respondents in my survey reported that they had heard of the fictitious control name "FHXN".[32] This 8.5% is simply a measure of survey error as discussed above, such as agreement bias and/or guessing. Since FHXN is neither the name of a company that measures customer satisfaction nor a customer satisfaction measure, the 8.5% is mismeasurement error or "noise" and is subtracted from the aided recognition percentages to calculate the net aided recognition. Judging by his criticism, it appears that Mr. Wallace lacks a fundamental understanding of a control in experimental survey design.

**Mr. Wallace's Relies on Ipse Dixit Instead of Data**

21. Mr. Wallace claims that he "had a strong awareness of the ASCI brand" prior to his involvement in this case,[33] yet in his report, in one of his survey questions, and in his rebuttal report, he represents the acronym of ACSI as American Consumer [sic] Satisfaction Index.[34] Mr. Wallace provides no data or other basis for his asserted "strong awareness" of the term ACSI.

22. Nonetheless, Mr. Wallace attempts to discredit my survey universe as improper without citing any source but himself. For example, he claims that "a proper screener…would have defined the relevant universe" precisely as he did and then cites his own report as an

---

[32] Wallace rebuttal, p. 5.
[33] Wallace report, p. 11.
[34] Wallace report, pp. 12, 41, 65, and 107; Wallace rebuttal, p. 2.

apparent authority.[35] As discussed above, Mr. Wallace's screener that required respondents to be aware of ACSI cannot come to any meaningful conclusion about the recognition of ACSI in the *field* of customer satisfaction.[36]

### Mr. Wallace's Nonstandard Questions

23. Mr. Wallace criticizes my survey for its purported "non-compliant methodology and survey questions."[37] He suggests three questions below as an allegedly "proper set of questions" to "determine the degree of *recognition* of the name ACSI".[38]

24. It is first noted that Mr. Wallace does not ask any of the following three proposed questions in this case, nor in the survey he conducted in the Genesys matter. Ultimately, Mr. Wallace seems to suggest that my survey's questions were "non-compliant" simply because I did not ask *his* questions. Yet simply creating three alternative questions of varying quality does not make some other questions "non-compliant."

25. The questions Mr. Wallace suggests in his rebuttal report to test "recognition" are as follows:

> *Do you believe that the term ACSI refers to one source or is a common name that refers to a category of sources?*
>
> *What do you believe the initials ACSI stand for?*
>
> *What is the source represented by the initials ACSI?*

26. Mr. Wallace's first suggested question to purportedly measure recognition appears to be an amalgam of different trademark survey concepts. The "Do you believe that

---

[35] Wallace rebuttal, p. 3.
[36] Wallace report, p. 8. "The ACSI Marks have become well recognized in the *field* of customer satisfaction…" (emphasis added)
[37] Wallace rebuttal, p. 3.
[38] Wallace rebuttal, p. 3, (emphasis added).

the term...ACSI is a common name" language is similar to those found in a "Teflon Survey"[39] where one generally asks respondents whether they understand a term to be a "brand name" or a "common name." To my knowledge, the "Teflon Survey" design has not been used to determine recognition and is most commonly associated with testing the primary significance of a disputed term. However, the phrase "refers to one source" is reminiscent of a potential secondary meaning question that asks whether a respondent associates a mark with a sole source or multiple sources. Thus, it appears that Mr. Wallace has intermingled concepts of genericness/primary significance and secondary meaning in this nonstandard question. This further demonstrates Mr. Wallace's misinterpretation of my survey as a secondary meaning survey, when it is plainly not.

27. Unlike his first proposed question, Mr. Wallace's second and third suggested questions arguably appear to be closer to the concept of recognition. However, instead of simply asking a respondent whether they have heard of or seen ACSI, Mr. Wallace's proposed questions create a more demanding task of requiring a respondent to know either the "initials" or "the source" of ACSI. Whatever portion of hypothetical responses elicited from these questions may be attributable to recognition of the term ACSI, Mr. Wallace's second and third questions would surely yield a _lower_ level of recognition than my aided recognition question, "With respect to customer satisfaction, have you heard of ACSI?"

---

[39] *See* E.I. DuPont de Nemours Co. v. Yoshida Int'l., 393 F. Supp. 502, 526 (E.D.N.Y. 1975) (By using the example of "Chevrolet — automobile" the interviewer first explained the difference between a brand name and a common name, and then asked whether each of eight names, including TEFLON, was a brand name or a common name.)

28. It is also noted that Mr. Wallace asks "What is the proper name for the ASCI?" as part of screening potential respondents to participate in his survey.[40] As discussed above, it makes no logical sense to attempt to measure recognition among a pre-screened group of respondents who exhibit recognition of the term you are attempting to measure. Furthermore, I fail to see how any of these proposed three questions would better help the court understand whether individuals involved in obtaining customer satisfaction data for their company (and therefore in the field of customer satisfaction) recognize ACSI when compared to my survey's aided awareness question.

**Mr. Wallace Appears to Make Legal Conclusions**

29. Despite Mr. Wallace's disclaimer that he was not asked to opine about any legal conclusions, he nonetheless claims his assignments include "determin[ing] if [the Ezell survey] methodology and stimuli…meet the general standards *for admissibility*".[41] I am not an attorney and do not offer any legal conclusions.

30. Additionally, Mr. Wallace criticizes my report for allegedly "missing" analyses of other factors considered in secondary meaning matters.[42] I am generally aware of secondary meaning and the factors considered to determine if a term has acquired distinctiveness, but I did not make any conclusions regarding secondary meaning. Rather, I opined that "the results of the [Ezell recognition] survey *support a finding* that ACSI is not well recognized in the field of

---

[40] Wallace report, p. 12.
[41] Wallace rebuttal, p. 2 (emphasis added).
[42] Wallace rebuttal, p. 6.

customer satisfaction."[43] Nonetheless, any analyses as to the details of the secondary meaning factors in this case, where appropriate, are for the finder of fact and not Mr. Wallace.

### Conclusion

31.     As detailed above, Mr. Wallace makes baseless criticisms and relies on ipse dixit and strained logic to attempt to discredit my survey. To the contrary, my survey is reliable.

32.     I reserve the right to supplement and/or revise my opinion and this report in response to any further information, including any additional documents or testimony, which may be brought to my attention.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed this 5th day of April, 2021, in Huntington Beach, California.

*[signature]*
_____
Matthew G. Ezell

---

[43] Ezell report, p. 9 (emphasis added).